UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SANDEEP GUPTA | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No.   4:13-cv-3663 |
| | § | |
| SCHWAN'S HOME SERVICE, INC. | § | |
| Defendant | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

     Plaintiff, Sandeep Gupta ("Gupta"), alleges the following against Defendant, Schwan's Home Service, Inc. ("Schwan's"):

**Parties**

1. Gupta is an individual who resides in Houston, Texas and is a lawfully admitted permanent U.S. resident.  Gupta should be reached through his attorney of record, Rajesh Mahadass of Paranjpe & Mahadass LLP at 3701 Kirby Drive, Suite 530, Houston, TX 77098.

2. Schwan's is a corporation that incorporated under the laws of the State of Minnesota. Defendant has its principal place of business in the State of Minnesota, offices in Austin, Texas (1106 Conroy, Manchaca, Texas 78652), Houston, Texas (6613 Gant Road, Houston, Texas 77066) or wherever else that it may be found.   Schwan's is represented by Kutak Rock LLP at 1605 North Waterfront Parkway, Suite 150, Wichita Kansas, 67206.

**Jurisdiction**

3. The Court has jurisdiction over the lawsuit because the suit arises under 42 U.S.C. §2000e and the lawsuit involves an unlawful employment practice.   The Court has diversity jurisdiction over the lawsuit because the suit arises between the Plaintiff, who is a Texas

citizen, and the Defendant, which is a company based in Minnesota with operations in Texas. 28 U.S.C. §1332(a)(1).

## Venue

4.   Venue is proper in this District under 42 U.S.C. §2000e-5(f)(3) because the alleged unlawful employment practice was committed in this District.   Several of the physical and verbal abuse incidents suffered by Gupta occurred in Houston, Texas.

## Exhaustion of Administrative Remedies

5.   Plaintiff timely filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission (EEOC).  Plaintiff files this complaint within 90 days after receiving a notice of the right to sue from the EEOC.  A copy of the notice of the right to sue is attached hereto as Exhibit "1".

## Facts

6.   Schwan's is a company that provides home delivery of prepared and frozen meals via "depots" located throughout the country, including several in Texas.   These depots are facilities that store the actual products Schwan's sells, as well as house the trucks that the products are sold from.

7.   Gupta was born in India to parents also from the country.  Shortly after his birth, he and his parents moved to Hong Kong where he was raised.  Gupta has a dark brown skin tone and is a practicing member of the Hindu religion.   After finishing high school in Hong Kong, Gupta moved to the United States in 1989, receiving both his Bachelor of Science in Management in 1993 and his Masters of Business Administration (MBA) in 1999 from Woodbury University in Burbank, California.

8.  During the decade between 1997 and 2007, Gupta worked as a Sales Manager or Account Manager for several companies including Pepsi Bottling Group a division of PepsiCo Inc., Johnson & Johnson Services Inc, and DHL International GmbH.

9.  Gupta began working for Schwan's in 2007.    After beginning his career at Schwan's in Greensboro, North Carolina, he moved to Austin, Texas around September 2007.  Gupta was employed by Schwan's as an Assistant General Manager, Business Transformation Agent, and General Manager, respectively, during Gupta's almost six (6) year employment with Schwan's.

10. In Austin, Gupta worked as an Assistant General Manager under District Manager Mike Morrison ("Morrison").  He also worked with General Manager Mike Knight ("Knight") and Sales Representative Mike Terrones ("Terrones").   As his supervisor, Morrison had the ability to fire, promote, transfer, and discipline Gupta, among other things.

11. Gupta's role as Assistant General Manager was to work with Knight, which included handling the day-to-day operations at the Austin depot, making sure Schwan's trucks, and the sales representatives operating them, were effectively delivering products to existing customers and/or going door-to-door and cold-calling homeowners for new business.

12. On one of his first few days of working at the Austin depot, Gupta was with Robert Winningham ("Winningham") as Winningham drove a Schwan's truck to make deliveries. Gupta asked Winningham if he could drive the truck for a little while, as Gupta had not practiced driving a truck in some time. Winningham called Knight to see if Gupta could drive the truck that day.   Knight wasn't sure if Gupta had the authorization of the Texas Department of Transportation to drive a truck, so Knight asked Morrison who was with Knight in the same room.  Morrison confirmed that Gupta could drive the truck. Immediately

following Morrison's confirmation, Knight responded over the phone, "Yes. Just don't drive the truck into the Capitol."

13. Shortly, thereafter, Gupta was subjected on a near daily basis to both derogatory name-calling and physical incidents while working at Schwan's Austin depot.

14. In particular, Morrison, Knight, and Terrones would hold Gupta down (or pin him by his arms) and then hit him in his groin, throw things at his groin, or slap his genitals with a ruler or stick, all while Gupta would plead with them to stop. Gupta would react with a pain-filled shout, but the Schwan's employees would continue their terrorizing attacks on a daily basis. At times, aside from physically hitting Gupta in his groin, Knight would lock him in one of the freezers at the depot, which Morrison also witnessed on at least one occasion, but just laughed in response to the abuse.

15. Further, Morrison, Knight, and Terrones, among others, would regularly call Gupta a "terrorist", "terrorist bomber", "rug head", "rag head", "towel head", "camel jockey", and "sand nigger" and other derogatory names. Additionally, Morrison, Knight, and Terrones called a Gupta a "Muslim" (which in this context was said in a derogatory manner, aside from the fact that Gupta is not a Muslim), said that Gupta couldn't "go into a bank with a back pack or a black bag", that Gupta was the "brother of Osama", and had "skills of bomb making and blowing things up", and that Gupta's family were members of terrorist organizations, which further perpetuated the Schwan's employee's attacks on Gupta and comparisons to a terrorist from the Middle East. The Schwan's managers, Morrison and Knight, as well as Terrones among others, would also attack Gupta's religion. Morrison and Knight, for instance, would tell Gupta that if he ate meat (he didn't eat beef or pork) they would give him days off. Further, on several occasions while buying supplies for the Austin

4

depot with Knight at Wal-Mart and/or Academy, Knight made several derogatory statements. During one incident, when Knight and Gupta were leaving the store, Knight turned to Gupta and loudly said, "You didn't put that (item) in your pants, without paying for it, did you?" On another occasion, again when leaving the store, Knight said to Gupta, "You made sure you paid for that right?  Because I know your type of people like to take things for free or for cheap."   Attached hereto as Exhibits "2", "3", and "4" are statements by former Schwan's employees confirming the conduct of Schwan's supervisors and other employees. Since Morrison, Gupta's and several other employees' supervisor, and Knight  made racial assaults and slurs towards Gupta, these attacks became so common-place around the work environment that other Schwan's employees at times would occasionally chime in with their own racist remarks to support their supervisors.

16. Throughout his time at the Austin depot, Gupta asked Morrison and the other Schwan's employees to stop their physical assaults and derogatory comments and slurs.  However, Morrison refused to cease his inappropriate conduct toward Gupta, and refused to direct any of the other Schwan's employees, such as Knight or Terrones, to stop either.

17. Even after a racially derogatory and defamatory manipulated photo was circulated via email between employees (including Morrison), Morrison, Gupta's own supervisor, and the supervisor of other employees, did nothing to stop the verbal and physical abuse against Gupta.  The photo in question had been manipulated in a fashion to make it seem like Gupta was holding a gun while being surrounded by a SWAT team.  The photo was yet another example of Schwan's employees comparing Gupta to a terrorist and the like because of his origin.  Attached hereto as Exhibit "5" is the email and manipulated photo of Gupta that was created and circulated by Schwan's employees.

18. Gupta confronted the creator of the photo and sender of the original email, Jeff Wagstaff, then a Schwan's Facilities Manager, whom Gupta had met a few times at district meetings prior to the email being sent. Aside from directly receiving the photo, Morrison was put on notice by Gupta that Gupta was very upset with the photo and its discriminatory nature. Still, Morrison did nothing to stop the dissemination of the photo or the other acts by Schwan's employees towards Gupta.

19. There were some Schwan's employees who were concerned about the treatment Gupta was subjected to while working at Schwan's. These concerned former and current Schwan's employees included, but are not limited to: Gary Conner ("Conner") a former Route Sales Manager, Robert "Butch" Barrington ("Barrington") a former Route Sales Manager, Jeff Barnett ("Barnett") a former Route Sales Manager, Casey Bragewitz ("Bragewitz") a former Sales Representative, Robert Winningham ("Winningham") a former Assistant General Manager, and Lane Jones. Barrington could not believe what was said and felt the conduct went way overboard for a work environment and felt several employees of Schwan's made derogatory comments. Exhibit "3". Barnett similarly felt that the derogatory comments made by other Schwan's employees, including Morrison, Knight, and Terrones was horrible and Barnett felt so strongly about that he left Schwan's within eighteen (18) months of his first day there. Exhibit "4". Bragewitz also heard the comments that he considered insensitive and could tell that the derogatory comments clearly bothered Gupta. One day at lunch while both he and Gupta still worked at Schwan's, Winningham also came to realize that the verbal and physical abuse by other Schwan's employees bothered Gupta.

20. As Conner states in Exhibit "2", many employees considered the treatment unacceptable but did not speak out against the actions of Schwan's managers because they were afraid of

6

Schwan's retaliating and firing them from their jobs or giving them a less desirable position or location to work out of.   Exhibit "2".

21. Still, at least one employee, Lane Jones ("Jones") did officially come forward while he was employed at Schwan's.  Jones was the Assistant General Manager at the San Antonio depot but would help at the Austin depot at times.  Jones saw Schwan's employees hit Gupta in his groin and heard the language and words they said to Gupta.  Jones filed a complaint on Gupta's behalf with the Ethics Hotline. The Ethics Hotline is a third-party phone system that receives complaints via phone calls from employees and customers.  The Ethics Hotline then records and makes notes on the complaint in an attempt to summarize the issue.  The Ethics Hotline then sends the actual complaint to Schwan's Human Resources Division.  Therefore, once Jones submitted his complaint, the Ethics Hotline then transmitted the complaint to the Human Resources Division of Schwan's. Jones knew Gupta was scared of retaliation, so he took it upon himself to file an official complaint on Gupta's behalf.

22. Gupta himself was scared to take his complaints further than his direct supervisor, Morrison, who himself was involved in the abuse Gupta suffered.  Gupta had heard from several Schwan's employees that the company had a culture of retaliation in that the names of other Schwan's employees that had made supposedly "confidential" or "anonymous" complaints were revealed to other Schwan's employees, including supervisors such as District Managers, which was what Morrison was.  The employees making the complaints were then "punished" in different ways, such as getting less desirable routes to sell products to or being moved to a less appealing area to work in.

23. Gupta's level of concern about retaliation if he went beyond his supervisor with his complaints increased when, after Jones filed the complaint, Morrison asked Gupta point

blank why Jones had called the Ethics Hotline. When Gupta asked Morrison how he knew who had called in, Morrison replied, "I am a District Manager, I know everything and watch what I do to him because they won't even touch me!" Shortly after that conversation, Jones was transferred to a smaller market in Brownsville, based on orders from Morrison.

24. Gupta was scared about losing his job at Schwan's if he went further than complaining to Morrison, his supervisor, for several additional reasons. First, Gupta and his wife were in the process of adopting a son, and thus Gupta had a bigger family to financially support. Second, Gupta wanted to stay at one company for a while as after he received his MBA he moved from one successful sales position to another, although that resulted in not being at any company for two years and thus caused him to wonder if his resume would cause future potential employers to be wary about him staying with them. Third, Gupta felt there was a culture of retaliation at Schwan's directly, as well. Gupta tried to apply for other positions at Schwan's (to get away from the oversight and general interaction with Morrison, Knight, Terrones, and others). These potential positions were with other divisions of Schwan's such as Schwan's Consumer Brands and Schwan's Food Services. During one phone interview with a Hiring Manager at Schwan's Food Services, after Gupta successfully defended his experience level against excuses that his experience was what specifically was preventing him from getting the position, the Hiring Manager specifically told Gupta that if Gupta's resume ever came across her desk again the resume wouldn't go any further. Thus, it was implied that Gupta wouldn't be able to get another position at Schwan's, even an entry-level position, because word had gotten around that Gupta and Jones had complained about Morrison.

8

25. Gupta continued to try and get away from the Austin depot, but to no avail. Gupta's suffering on a daily basis caused him to feel tremendously uncomfortable and fearful about Schwan's personnel's verbal and physical actions. Morrison, Knight, and Terrones realized this, and at times when they were not making derogatory statements or actually hitting Gupta in his groin, they would purposely, and for their own maniacal pleasure, make quick threatening movements as if they were about to hit him, and then not, which made Gupta flinch back, in fear of being tortured as he had been times before.

26. Because of the verbal statements and physical actions, Gupta reached a point where he would have to spend much of his day away from his physical office and the common areas in order to escape the verbal and physical abuse of Morrison, Knight, and Terrones. Gupta became routinely emotionally distressed, while at work and even at home, because much of his time was spent working for a company whose employees constantly verbally and physically attacked him. His personal life with his wife also severely suffered as his wife, as well as his friends and other family members, recognized Gupta's negative mood and emotionally distressed state. Tension arose at the Gupta household because Gupta was embarrassed about the emasculating torture and assaults that he was being subjected to at Schwan's. Gupta was unable to bring himself to share the reason behind his emotional distress and negative mood even with his wife, for a period of years.

27. Several employees throughout Schwan's had heard about Gupta's ordeal, including Jeff Taggart ("Taggart"). In about October 2008, Taggart, then the District Manager in Houston, asked Gupta if he wanted to join Taggart at the Houston depot. Of course, Gupta immediately said yes as the move would get him away from Morrison, Knight, Terrones, and others. Still, the necessary steps for the move took a little while to complete. Gupta

transferred to the Houston depot in about March 2009 at the request of Taggart and the two had a respectful relationship as supervisor and employee that Gupta never had under Morrison.

28. Still, within a few months, Taggart was forced to resign from Schwan's, and Morrison's area of supervision was expanded to include the territory that included Houston, which would mean Morrison would physically come to the Houston depot at times and thereby again be in close proximity to Gupta.

29. Realizing that he could potentially be back in the same situation with a supervisor that verbally and physically assaulted him (and allowed others to do the same), Gupta called Morrison soon after Morrison took over the Houston territory and pleaded with Morrison not to continue with the same derogatory and assaultive interactions with Gupta that he had before.

30. Rather than ceasing his reign of terror, Morrison and other Schwan's employees, including Knight, continued to verbally and physically assault Gupta at the Houston depot and depots throughout Texas, including San Antonio, the site of several district meetings.

31. On July 18, 2012 at the start of a district meeting in San Antonio, when all the attendees were shaking hands, Knight made a threatening motion towards Gupta as if he was going to punch him, yet again, in the groin. Gupta immediately responded to Knight by saying, "Man, come on, stop that shit!" Then Gupta turned to Morrison, who witnessed what had just happened, and said, "Mike, come on, I told you about this." Later during the same meeting, Gupta was standing by his seat at the conference table. Morrison walked out of the nearby restroom and aggressively threw a wet paper towel at Gupta's groin in front of other managers and employees. Upon impact, Gupta let out a shout, but several other employees,

including his supervisor Morrison, only burst out into laughter.   Immediately after being hit, Gupta directly confronted Morrison yet again, stating "I have had conversations with you many times about this and have asked you to stop."   Still, like before, even after being asked personally by Gupta to stop, Morrison continued with his abuse.

32. A couple of hours later at the same district meeting, right after the meeting was dismissed, Gupta walked around the conference room to shake all the other employee's hands.  When Gupta got to Knight, he extended his hand out to say goodbye.   Instead of simply reciprocating, Knight turned around and made a threatening motion as if he was going to punch Gupta, yet again, in the groin.   Still being scared of Morrison and Knight, among others, Gupta jumped back in fear to avoid contact.   Knight and a few other employees just laughed at Gupta's obvious fright.   Several other employees saw what Gupta experienced at the San Antonio district meeting including Chris Triplett (the current Manager of the Conroe depot), Ray Galvan (current Manager of the Corpus Christi depot) and Darren Buccellato (current Assistant District Manager).

33. Aside from having to deal with Morrison's physical and verbal assaults at district meetings, because Morrison's territory now included Houston, Morrison came to visit the Houston depot that Gupta now worked at several times in 2012.   During these visits, Morrison continued his acts of predatory terror upon Gupta, in that he continued his racist and threatening attitude towards Gupta, now even making various statements to Gupta in front of Gupta's team of employees he led.

34. For example, on a visit to the Houston depot on July 24, 2012 while talking with Gupta, Jim Allen (formerly a Manager in Houston and now a Sales Representative), and Chris Ponder (a Schwan's Human Resources personnel), Morrison spoke about an employee by the name of

Stephanie who Morrison considered a problem employee. Morrison said that someone should "hit Stephanie with a bat", and then Morrison turned specifically to Gupta and said, "all you need to do is to tell Stephanie, 'Bitch, do what I tell you to do, or else I will call my people to come and bomb you!' and then call your boy Osama".   During that same visit, after hearing good things about Gupta's work in Houston from other employees, Morrison coldly turned to Gupta, in front of much of Gupta's team, and said, "I think you suck as a manager!"

35. On another visit by Morrison on August 28, 2012, Morrison, Chris Ponder (a member of Schwan's Human Resources Division), Keith McColley, Jim Allen, and Gupta were standing in front of the conference room around lunchtime.  The group was trying to decide what to do for lunch, and Jim Allen suggested Chick-fil-A.   Morrison turned to Gupta and commanded him to go order and bring the food back to the depot. Keith McColley offered his credit card, and Gupta took it and started walking away.  With Chris Ponder and Jim Allen still in front of the conference room (after giving his credit card, Keith McColley had walked back into the conference room), Morrison said to Gupta, "why don't you take Jim with you as I am sure they will have difficulty understanding you with your accent…".  At that point, Chris Ponder started laughing and then Morrison mocked Gupta by adding in an exaggerated Indian accent, "Hello.  My name is Sandeep and I am calling from Dell…"  Gupta turned to Morrison and said, "That is not funny."  After hearing Gupta, Morrison just repeated himself and Chris Ponder laughed even louder.  Jim Allen just kept his head down.  Gupta then turned and looked at Chris Ponder, Schwan's own Human Resources personnel, and said, "Man that is not funny.  Aren't you going to say something?"  Schwan's Human Resources personnel just carried on laughing, and Gupta left the group with Jim Allen to follow his supervisor's orders to get lunch.

36. These racist and derogatory statements and physical assault of Gupta also laid the foundation for Gupta's extreme apprehension about attending meetings with Morrison in Houston, or at district meetings in other Texas cities. Gupta was constantly on edge about what physical or verbal assaults might come next**.**  Although Gupta and others had repeatedly told the offending parties personally to stop, and a formal complaint was filed on Gupta's behalf, the conduct by Morrison and other Schwan's employees never ceased.

37. Finally, towards the end of 2012, the assaults had taken its toll. Feeling as if he had no other choice, Gupta courageously decided to risk the welfare of his family and submit his resignation at Schwan's and accept a much lower paying position at another company. The continuous verbal and physical assaults, repeatedly unchecked and even ignored by Schwan's own Human Resources division, made working at Schwan's extremely unbearable for Gupta. About two weeks later, on January 10, 2013, Gupta worked his last day at Schwan's after years of abuse on the part of his supervisor, Morrison, and various other Schwan's employees.

38. Aside from various Schwan's employees, both current and former, witnessing and knowing about the verbal and physical abuse Gupta dealt with on a daily basis, Schwan's own Human Resources Division knew about it too because on that last working day of Gupta's career at Schwan's, Chris Ponder, the Schwan's Human Resources personnel who actually witnessed some of the incidents, called Gupta.  During that phone call, Ponder made it clear that Schwan's knew about the aforementioned incidents during Gupta's almost six years at Schwan's, and well before Gupta even filed his charge with the EEOC.  Although, Schwan's Human Resources Division knew about Gupta's struggles, it was only when he was walking out the door did the company even contact him to get more details of Gupta's torturous

experience.  Ponder specifically stated that he was calling to make sure that what happened to Gupta "never happens again."  The company never took any action before this, even though they clearly knew what was going on. Further, Ponder was a party to the actions, even participating in the racial mockery against Gupta.

39. As of the filing date of this complaint and petition, Morrison, and several of the other offending employees, still work at Schwan's.

<b>Hostile Work Environment Under Title VII</b>

40. The preceding paragraphs are incorporated by reference.

41. Gupta is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely because of his race, color, religion, and national origin.

42. Defendant is an employer within the meaning of Title VII.   Gupta was employed by Defendant as an Assistant General Manager, Business Transformation Agent, and General Manager, respectively, during Gupta's almost six (6) year employment with Schwan's.

43. Defendant intentionally discriminated against Gupta in violation of Title VII by creating a hostile work environment.

44. To prevail on a claim of hostile work environment under Title VII, an employee must make a prima facie case of the following elements:  (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome harassment (3) that the harassment was based on his membership in the protected class; (4) that the harassment affected a term, condition, or privilege of his employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.  *E.E.O.C. v. WC&M Enterprises, Inc., 496 F.3d 393, 399 (5th Cir. 2007).*

45. Gupta is a member of a protected class as he is of Indian descent and a member of the Hindu religion.

46. Gupta was subject to daily unwelcome verbal assaults, which included name calling (such as: "terrorist", "terrorist bomber", "rug head", "rag head", "towel head", "camel jockey", and "sand nigger"), and physical assaults (including being punched in the groin and hit in the groin with a ruler or stick, and being locked up in a freezer). These physical and verbal assaults was unwelcome in that Gupta on several occasions told the offending parties, which included his supervisor Morrison, to stop their offensive conduct.

47. The verbal and physical harassment Gupta endured was based on his membership in the protected class. Aside from being born in India and being a practicing Hindu, Gupta has dark brown skin, and the harassment, especially those verbal terms equating Gupta to a Middle Eastern terrorist, stemmed from Gupta's physical characteristics and membership in a protected class. Schwan's employees made the derogatory comments they did because Gupta did not look or speak like them. The employees, including his own supervisor, constantly referred to his physical characteristics in their statements and the physical assaults only added to the derogatory way the employees interacted with Gupta. Similarly, the manipulated email that was distributed by a Schwan's employee to other employees painted Gupta as a threatening brown man akin to a terrorist. Morrison, Knight, Terrones, and even Ponder, among others, succeeded in creating a hostile environment throughout Schwan's that preyed upon Gupta, simply because he has brown skin and is of Indian descent.

48. The verbal and physical assaults by Morrison and others throughout Gupta's employment with Schwan's affected the terms, conditions, and privileges of Gupta's employment at Schwan's. Unlike employees who did not have brown skin or were not from India, Gupta

was subjected to constant verbal and physical harassment. This caused Gupta to constantly be on edge and stressed about what hurtful verbal or physical assaults might come next and when Gupta was actually assaulted he would feel extremely embarrassed and hurt emotionally, physically, or both. His ordeal got to the point where Gupta was terrified of going to work because he was physically and verbally attacked on a daily basis. Further, Gupta became emotionally distressed and his mood negatively changed so significantly, because of the environment at work, that his wife and other family and friends noticed. In spite of the Schwan's employees' assaults on him, and Schwan's management refusing to help Gupta by stopping the abuse (let alone participating in it), Gupta gathered enough courage to go to the Schwan's depot on a daily basis. After years of physical and verbal torture that Gupta was forced to endure because of Morrison, Knight, and Terrones, just to go to work and earn a living for his family, Gupta was in constant fear of future assaults. Knowing this, Morrison, Knight and Terrones would purposely make threatening movements towards Gupta as if they were going to hit him again. These threatening movements would cause Gupta to cower and try to retreat in fear. Gupta reached a point where he would have to spend much of his day at the depot away from his physical office and the common areas where the offending employees may have most likely been in contact with him. These derogatory statements and physical harassment of Gupta also made Gupta very apprehensive about attending meetings with Morrison at the Houston depot or at district meetings in other Texas cities, and kept Gupta constantly on edge about what physical or verbal abuse might come next. By being forced to be away from the offending employees and being so scared to attend meetings, Gupta no longer had the same terms, conditions, or privileges of other Schwan's employees in his similar employment position.

49. Schwan's knew or should have known of the harassment and failed to take remedial action. Gupta on multiple occasions told the offending employees, including his supervisor Morrison, to stop their offending conduct.  Additionally, several employees complained about the treatment of Gupta, including Jones who filed an official complaint with the Ethics Hotline.  Even more telling, on Gupta's last day at Schwan's, Ponder, Schwan's own Human Resources personnel (who actually witnessed some of the verbal abuse himself) contacted Gupta to further discuss the harassment Gupta suffered, evidencing that Schwan's Human Resources already knew what had been going on.

50. If the harasser is a supervisor with authority over the employee, only the first four elements need to be shown.  *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).  Further, to show Hostile Work Environment, in this situation, Gupta does not even need to show that Schwan's knew or should have known of the harassment and failed to take remedial action because Morrison was Gupta's supervisor who had the ability to fire, promote, transfer, and discipline Gupta, among other things.  Gupta's supervisor was among the offending employees, was among the people that Gupta personally told repeatedly about the harassment, and among the people that Gupta repeatedly told to stop.

51. As a direct and proximate result of the Schwan's hostile work environment that Gupta endured for almost 6 years Gupta suffered injuries and damages in the amount of three hundred thousand dollars ($300,000.00).

**Sexual Harassment Under Title VII**

52. The preceding paragraphs are incorporated by reference.

53. Schwan's is additionally liable to Gupta for Sexual Harassment under Title VII.

54. Plaintiff is a male employee protected under Title VII.

55. Defendant is an employer within the meaning of Title VII. Gupta was employed by Defendant as an Assistant General Manager, Business Transformation Agent, and General Manager, respectively, during Gupta's almost six (6) year employment with Schwan's.

56. Defendant intentionally discriminated against Plaintiff in violation of Title VII by creating a sexually hostile work environment.   Morrison's, Knight's, and Terrones' conduct unreasonably interfered with Plaintiff's work performance.   Specifically, on a routine basis Gupta's supervisor and the other employees would hold Gupta down (or pin him by his arms) and then hit him in his groin, throw things at his groin, or slap his genitals with a ruler, all while Gupta would plead with them to stop.    Further, once Morrison and the other employees realized that Gupta was beyond shaken and fearful of the ongoing conduct, the employees at times would make quick movements and pretend they were about to hit Gupta in his genitals.   Even after he transferred to the Houston depot, Morrison and the other Schwan's employees continued their sexual harassment of Gupta during visits to the Houston depot and during district meetings in other Texas cities that Gupta attended with Morrison. By routinely hitting or pretending to hit Gupta in his groin, Gupta's suffered on a daily basis because he felt tremendously uncomfortable and fearful about Schwan's employee's verbal and physical actions. Gupta ended up using other areas of the depots and even other depots at times, and thus became less productive and spent more time on tasks, to avoid the physical proximity to the offending employees that remaining in his physical office or the common areas of the depot would cause.   Further, Gupta become emotionally distressed and his mood negatively changed so significantly, because of the environment at work, that his wife and other family and friends noticed. This routine of hitting or pretending to hit Gupta in his groin also made Gupta very apprehensive about attending meetings with Morrison at the

Houston depot or at district meetings in other cities, and kept Gupta constantly on edge and stressed about what physical or verbal abuse might come next.

57. Defendant did not exercise reasonable care to prevent and cure allegations of sexual harassment. Defendant ratified the wrongful conduct by failing to take appropriate remedial action after becoming aware of the conduct. Schwan's was made aware of the conduct both because Morrison, Gupta's supervisor, was one of the offending parties and had been told by Gupta on numerous occasions to stop his offending conduct, and because Schwan's own Human Resources knew about the conduct.

58. As a direct and proximate result of the Schwan's sexual harassment that Gupta endured for almost 6 years Gupta suffered injuries and damages in the amount of three hundred thousand dollars ($300,000.00).

**Continuing Violations Doctrine**

59. The preceding paragraphs are incorporated by reference.

60. Using the Continuing Violations Doctrine, Gupta's claim of hostile work environment and sexual harassment under Title VII can take into account all of the incidents of verbal and physical abuse he suffered at the hands of Schwan's employees, including his own supervisor Morrison, during his almost six year employment with Schwan's.

61. The continuing violation doctrine has been applied by the Fifth Circuit to Title VII claims of hostile work environment. *Lopez v. Kemp*, 684 F. Supp. 2d 827, 860 (S.D. Tex. 2010).

62. This doctrine extends the limitations period on otherwise barred claims only when the unlawful employment practice manifests itself over time, rather than a series of discrete acts. To constitute a continuing violation, a plaintiff must show: 1) more than a series of discriminatory acts; 2) an organized scheme leading to and including present violations; 3) a

continuing system of discriminatory practices produced effects that may not manifest themselves as individually discriminatory except in accumulation over a period of time; and 4) that one of the acts falls within the limitations period.  Id.

63. If a plaintiff satisfies the requirement for demonstrating a continuing violation, the court may then consider all acts alleged to have contributed to the hostile work environment.  Id.

64. While the discrete verbal and physical abuses against Gupta on their face do not separately tend to show a hostile work environment, The actions of Gupta's supervisor, Morrison, Knight, Terrones, and other Schwan's employees, fit within an "organized scheme" to create an extremely hostile work environment. Morrison, Knight, and Terrones purposely targeted Gupta because of where he was from and what he looked like.  They then verbally and physically assaulted him in private, when they were with others in small groups, and in larger group settings.  These actions went on for years, and caused Gupta to always be on edge, stressed, and emotionally distressed about what might come next.

65. Without anyone at Schwan's stopping their conduct, Morrison, Knight, Terrones, among others, laid the foundation for Gupta's fear and emotional distress by torturing him for years. These offending employees, including his supervisor, then preyed on the extreme emotional distress that Gupta had become a victim of. The way Gupta reacted to the verbal and physical attacks that occurred in 2012, which are definitely within the limitations period, were how a person who had been abused, tortured, and constantly worried about future attacks would react to new acts by the same Schwan's supervisors and employees.  Morrison and Knight, among others, continued their "organized scheme" of inflicting derogatory words and physical attacks on Gupta in 2012 and got the reaction they did from Gupta because of what they had already done to him for years.  They made threatening movements (that Gupta

reacted to because he had been actually hit multiple times before), threw things at his groin (that Gupta reacted to out of pain and because it had happened many times before), and they again compared him to a terrorist because of where he was from.    These new acts continued the hostile work environment Gupta was subjected to because these same offenders, including his very own supervisor, had done this before and Gupta was unable to get away from the abuse before or in 2012 despite various people complaining about the way Gupta was treated.  Thus, all the verbal and physical abuse that caused Gupta to suffer in a hostile work environment and sexually hostile work environment over his almost six years at Schwan's should be considered in his claims.

**Damages**

66. As a direct and proximate result of Schwan's conduct, Gutpa suffered the following damages:

   a. Plaintiff was constructively discharged from employment with Defendant.  Although Plaintiff has diligently sought other employment, he has been unable to find a job at comparable pay.    In addition, Plaintiff has incurred expenses in seeking other employment.

   b. Plaintiff suffered a reduction in retirement benefits.

   c. Plaintiff suffered mental anguish and emotional distress in the form of constantly feeling worried and uncomfortable while at the Schwan's depots or district meetings, in anticipation of being at the Schwan's depots or district meetings, and stress both while at work and at home.

**Attorney Fees**

67. Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42 U.S.C. §2000e-5(k).

**Prayer**

68. For these reasons, Plaintiff asks for judgment against Defendant for the following:

    a.  $300,000.00 for damages resulting from Schwan's actions and inactions.

    b.  Attorney's fees.

    c.  Costs of suit.

    d.  All other relief the Court deems appropriate.

Respectfully submitted by,

Paranjpe & Mahadass LLP

_____/s/   Rajesh  Mahadass_____
Rajesh Mahadass
SBN: 24050980
Southern District: 2016952
3701 Kirby Drive, Suite 530
Houston, TX 77098
RMahadass@pandmllp.com
Tel.:   832-667-7700
Fax:    832-202-2018

ATTORNEY IN CHARGE FOR
Gupta, Plaintiff

22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SANDEEP GUPTA | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. <u>4:13-cv-3663</u> |
| | § | |
| SCHWAN'S HOME SERVICE, INC. | § | |
| Defendant | § | |

<u>PLAINTIFF'S DEMAND FOR JURY TRIAL</u>

Plaintiff, Sandeep Gupta, asserts his right under the Seventh Amendment to the U.S. Constitution

and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

Respectfully submitted by,

Paranjpe & Mahadass LLP

<u>    /s/   Rajesh  Mahadass      </u>
Rajesh Mahadass
SBN: 24050980
Southern District: 2016952
3701 Kirby Drive, Suite 530
Houston, TX 77098
RMahadass@pandmllp.com
Tel.:   832-667-7700
Fax:    832-202-2018

ATTORNEY IN CHARGE FOR
Gupta, Plaintiff

23

## VERIFICATION

State of Texas        §
Harris County        §

Before me, the undersigned notary, on this day personally appeared SANDEEP GUPTA, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is SANDEEP GUPTA. I am capable of making this verification. I have read PLAINTIFF'S ORIGINAL COMPLAINT. The facts stated in it are within my personal knowledge and are true and correct."

_____
Sandeep Gupta

Sworn to and subscribed before me by Sandeep Gupta on _December 11_, 2013.

_____
Notary Public in and for
the State of Texas



BARBARA A PEREZ
My Commission Expires
August 27, 2014

EEOC Form 161-B (11/09)  **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:  **Mr. Sandeep Gupta**
27511 Macy Hills Court
Spring, TX. 77386

From:  **Houston District Office**
**Total Plaza**
**1201 Louisiana, Suite 600**
**Houston, TX. 77002**

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 846-2013-20018 | **Ronnette Ramirez,**<br>**Investigator** | **(713) 651-4958** |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Elizabeth L. Hend*                           NOV 2 9 2013

R.J. Ruff, Jr.,
**District Director**                           (Date Mailed)

Enclosures(s)

cc:  **Mr. Alan L. Rupe, Attorney**
**Kutak Rock LLP**
**1605 N. Waterfront Parkway, Ste. 150**
**Wichita, KS. 67206**

**Mr. Lowell Keig, Exec. Director**
**TWC/Civil Rights Division**
**101 East 15th Street, Room 144-T**
**Austin, TX. 78778**

**Mr. Raj Mahadass, Attorney**
**Paranjpe & Mahadass, LLP**
**3701 Kirby, Ste. 530**
**Houston, TX. 77098**

EXHIBIT 1



GARY M. CONNER

July 15, 2013

Ms. Bailey Bunge
Paranjpe & Mahadass LLP
Attorneys and Counselors at Law
3701 Kirby Drive, Suite 530
Houston, Texas 77098

Dear Ms. Bunge:

Pursuant to our phone conversation July 12, 2013, below are my comments regarding the acts I recall when employed at the "South Austin Sales" depot of Schwan's Home Food Services, 1106 Conroy, Manchaca, Texas (Austin Depot).

During my employment with Schwan's (May 2008 – November 2009) I worked as a Route Sales Manager for retail sales and deliveries on a designated retail sales route. Part of our work duty was to attend all regularly scheduled sales, product, and equipment training meetings.

At many of those meetings I observed the Depot Manager and the District Manager (Mike Knight and Mike Morrison respectively) engage in behavior targeting Mr. Sandeep Gupta (a Schwan's Assistant Management level employee) in a harassing and assaultive manner.

On numerous occasions Mr. Gupta was physically held with his arms pinned while Messrs. Knight and Morrison threw items at Mr. Gupta's genitals and slapped at his genitals with a ruler. These acts were committed while Mr. Gupta was pleading with them to let him go and to please stop.

I witnessed Mr. Gupta often referred to by these "managers" as a "terrorist bomber," "a rug head," and as a "camel jockey."

I observed these types of acts conducted against Mr. Gupta prior to, immediately after, and during these required training meetings, in the presence of fellow employees in attendance.

Mr. Gupta told me on several occasions that he had tried to negotiate with these managers to halt this type of behavior, asking that it please stop, but I observed the behavior continuing as routine up until the time I left the company in November 2009. Not only was the behavior unprofessional for a supposed work environment at minimum, such behavior would not be acceptable or so much as tolerated from children in a Kindergarten class. I was unable to assist in halting such behavior as I was in dire need of employment at the time and was afraid that I would be dismissed if I were to speak out against not only the Depot Manager's conduct, but that of a District Manager as well. I believe that my fellow co-workers were unable to intervene for very similar reasons.

Should you have any further questions or if I can be of any further assistance, please do not hesitate to contact me. My phone number is ( ▮▮▮▮▮▮▮▮

Sincerely,

Gary Conner

EXHIBIT 2

**Bailey Bunge**

| | |
|---|---|
| **From:** | Butch Barrington |
| **Sent:** | Thursday, July 11, 2013 3:40 PM |
| **To:** | bbunge@pandmllp.com |
| **Subject:** | Sandeep |

To Whom It May Concern:

I worked with Sandeep at Schwan's Home Food Service for several years.  I worked at Schwan's from 2003 thru 2011.  (I am going to say the titles are Depot Manager and Route Manager even though I know that is not correct.)  Mike Morrison was Depot Manager in Austin when I started and was promoted to RVP, Mike Knight was brought in as Depot Manager soon after that, Mike Terrones(spelling?) was another Route Manager like myself.  (I mention him because he became a Depot Manager in Round Rock after I left, and he is another Mike.)  Morrison was at our depot so much as RVP that we saw Sandeep, Henry, Lane, and Robert being trained for management.  I don't remember their last names.  Robert became a Depot Manager just outside of San Antonio, Lane also became a Depot Manager (I don't know where) and Henry became the Austin Depot Manager after Mike Knight.  I believe Sandeep remained in training, I could be wrong.

As for information on what Sandeep had to endure... Wow!  I could not believe the things that were said.  Raghead, camel jockey, can't go into a bank with a back pack, or a black bag.  I thought it was way overboard, however, our RVP was right there, meaning Mike Morrison.  Mike Terrones seemed to be the biggest culprit, but he was also one of the best Route Managers in Texas.  I never saw them do anything physical to Sandeep, however, they brought in a whip and actually took a couple of pops at each other, making contact, Terrones and Knight while Morrison was there.  Kind of like, I can take it, can you?

I am always curious as to how people have been brought up.  Sandeep was riding along on my route when I started asking him where he was brought up.  Born in India, raised in Hong Kong? and he could speak Chinese.  I asked about what he watched on TV.  I watched Roy Rogers, Lone Ranger, Tonto.  Wait, I have an Indian side-kick.  I started calling him Tonto.  I may be just as guilty as my co-workers.

Henry is black and is still the Austin Depot Manager.  "He thinks he is white." I don't remember who said it.  We have had females that had to endure similar comments "lesbian" and one became an Assistant Depot Manager when I started.

I wish Sandeep all the luck in the world.  He took all this and remained a friend through it all.


Robert "Butch" Barrington



EXHIBIT 3

1

**Bailey Bunge**

| | |
|---|---|
| **From:** | Jeff Barnett ███████████ |
| **Sent:** | Thursday, July 25, 2013 5:19 PM |
| **To:** | Bailey Bunge |
| **Subject:** | Re: Sandeep Gupta |

Hi Bailey,

I am not exactly sure on the dates I worked there but I believe it was around 2007 - 2008. I was hired on as a route builder and then once a route came open I was promoted to route manager. I witnessed Sandeep being made fun of on a daily basis, being called a terrorist, muslim, towel head, ect by Mike Morrison, Mike Knight, and Mike Terrones. He also was physically abused being hit repeatly in the testicals on several occasions by Mike Knight and Mike Terrones. We as a group working there were CONSTANTLY being talked down on, degraded, and made fun of on how much better our sale numbers could/should have been. Usually every morning the "Mike's" would be reading the newspaper and if there was anything involving middle easterners Sandeep was always asked things like "Why are your people doing this?" "Is that how you guys do things over there?" I have ALWAYS worked a minimum of two years at every job I have had since I was sixteen years old but was only able to manage a year and a half there at Schwan's because of the horrible daily treatment we received. If there is anything else or more details you guys would like or need please let me know.

Thanks,
Jeff


On Thu, Jul 25, 2013 at 10:37 AM, Bailey Bunge <bbunge@pandmllp.com> wrote:

Good Morning Jeff,

We just spoke and I am emailing you to provide you with our contact information. Please send back a detailed account of what you saw, heard, experienced, in relation to abuse, hostile work environment, discrimination etc by Schwan's to Sandeep Gupta. Please give as much detail as you can, dates, people involved, other possible witnesses, where you were, etc. Feel free to include any other information you may feel is pertinent. Will you please also include your position with Schwan's at the time and the dates of your employment with the company? If you have any questions, or if there is anything we can do, please do not hesitate to call or email.

Thank you in advance for your effort and time on this important matter.


Bailey Bunge

Administrative Secretary

Paranjpe & Mahadass LLP

Attorneys and Counselors at Law

3701 Kirby Drive, Suite 530

EXHIBIT 4

Houston, TX 77098

Ph.: <u>832-667-7700</u>

Fax: <u>832-202-2018</u>

Confidentiality Notice: This communication, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C Sections 2510-2521 and is legally privileged. This e-mail and any attachments are for the exclusive use of sender and addressee and may contain privileged, proprietary and/or confidential information which are protected by the attorney-client, work product and/or other privileges. If you are not the intended recipient and/or have received this e-mail and any attachments inadvertently, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail or collect telephone call and delete this transmission permanently from your computer and destroy this communication and any attachments, including any copies.

EXHIBIT  4



EXHIBIT 5

## G✉ail
by Google

**Raj Mahadass** ▬▬▬▬▬▬▬▬     ▬▬▬

---

## Fw: safety poster

**sandeep gupta** ▬▬▬▬▬▬▬▬▬▬                          Mon, Oct 7, 2013 at 9:12 AM
Reply-To: sandeep gupta ▬▬▬▬▬▬▬▬▬▬
To: raj attorney <rmahadass@pandmllp.com>


----- Forwarded Message -----
**From:** christie gupta ▬▬▬▬▬▬▬▬▬▬
**To:** sandeep gupta <▬▬▬▬▬▬▬▬▬▬
**Sent:** Sunday, October 6, 2013 6:43 AM
**Subject:** FW: safety poster


--- On Thu, 4/9/09, Sandeep Gupta RSOPSXG <Sandeep.Gupta@schwans.com> wrote:

> From: Sandeep Gupta RSOPSXG <Sandeep.Gupta@schwans.com>
> Subject: FW: safety poster
> To: "christiegupta▬▬▬▬▬▬▬   <christiegupta ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬
> Date: Thursday, April 9, 2009, 1:56 PM
>
>
>
>
>
>
>
>
>
> From: Jeff Wagstaff
> DW07380
> Sent:
> Wednesday, March 18, 2009 3:01 AM
> To: Lane Jones; Sandeep Gupta
> RSOPSXG; Jeff Taggart; Mike Morrison
> Subject: safety
> poster
>
>

EXHIBIT 5

>
> this will be good
> for a Safe @ Schwans poster
>
> right
> on
>
> jw
>
>
> This entire email
> message (including all
> forwards and replies) and any attachments are for the sole
> use of the intended
> recipients(s) and may contain proprietary, confidential,
> trade secret,
> work-product, attorney-client or privileged information. Any
> unauthorized
> review, use, disclosure or distribution is prohibited and
> may be a violation of
> law. If you are not the intended recipient, please contact
> the sender by reply
> email and destroy all copies of the original message.
>
>



**tester.jpg**
516K

EXHIBIT 5